JOHN E. AMOS, Jr., Exr.

*v.*

THE AMERICAN TRUST AND SAVINGS BANK, Conservator.

*Opinion filed April 17, 1906.*

1. EVIDENCE—*testimony of intimate acquaintances as to mental capacity is stronger than that of comparative strangers.* Upon the issue of the mental capacity of a grantor, the testimony of witnesses having long and intimate. acquaintance with the grantor has more probative force than that of witnesses who have known the grantor but a short time or who have only seen him and conversed with him casually.

2. APPEALS AND ERRORS—*chancellor's findings of fact are not lightly disturbed.* A court of review will not disturb the chancellor's findings of fact from conflicting testimony unless error therein is clearly apparent.

3. LUNATICS—*one dealing with a person known by him to be insane acts at his peril.* One who loans money to a person known by him to be insane acts at his peril, and if, by reason of his insanity, the borrower loses or squanders the money, a court of equity, at the suit of his conservator, may cancel the note and trust deed given as security for the loan without requiring a return of the consideration to the lender, particularly where fraud was practiced by him in obtaining the note and trust deed.

4. NOTICE—*notice to money lender's agent of borrower's insanity is notice to the lender.* Notice to an attorney of the insanity of his client is notice to the attorney's wife, for whom the attorney is acting as agent in making a loan to the client.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. E. F. DUNNE, Judge, presiding.

HELMER, MOULTON & WHITMAN, for appellant.

JOHN J. KNICKERBOCKER, (JOHN W. SMITH, of counsel,) for appellee.

Mr. JUSTICE HAND delivered the opinion of the court:

This was a bill in chancery filed by the American Trust and Savings Bank, as conservator of Joseph J. Miller, an insane person, in the circuit court of Cook county, against John E. Amos, Jr., Rosalie G. Amos, wife of John E. Amos, Jr., and Henry W. Price, successor in trust of John E. Amos, Jr., to cancel a promissory note for the sum of $4000, bearing date April 8, 1903, payable to the order of Rosalie G. Amos two years after date, with six per cent interest, and signed by Joseph J. Miller; also a trust deed of even date with said promissory note, conveying certain real estate, improved with two dwelling houses, situated in the city of Chicago, to John E. Amos, Jr., as trustee, to secure the payment of said promissory note, which trust deed was signed and acknowledged by Joseph J. Miller on April 22, 1903, and recorded on the same day in the recorder's office of Cook county. Answers and replications were filed, and a trial was had in open court upon oral testimony and depositions, and a decree was entered in accordance with the prayer of the bill, which decree was affirmed by the Appellate Court for the First District, and Rosalie G. Amos having died pending the appeal in the Appellate Court, and John E. Amos, Jr., having been appointed and duly qualified as her executor and substituted as a party appellant in her stead, the latter has prosecuted an appeal, individually and as executor, from the judgment of the Appellate Court to this court.

The questions presented on this appeal for decision are mainly questions of fact. It appears from the undisputed

evidence that Joseph J. Miller, at the time of the execution of said note and trust deed, was about sixty-eight years of age; that for thirty-five years prior to their execution he had been afflicted with epilepsy; that up to within fifteen years of the date of said note and trust deed he had been a successful business man and accumulated a considerable amount of property, but for several years prior to the date of their execution his physical and mental powers had become greatly impaired from the effects of said disease; that John E. Amos, Jr., a lawyer in practice in the city of Chicago, in the year 1902 became the attorney of Joseph J. Miller; that prior to Amos' connection with Joseph J. Miller said Miller owned the property covered by said trust deed, a store building on Cottage Grove avenue, also unimproved real estate in Humboldt Park, a suburb of the city of Chicago, which last mentioned property was of the value of from $15,000 to $20,000; that Joseph J. Miller owed no debts; that his improved property furnished an ample income to support him and meet all of his liabilities; that he then made his home with his two sisters, who resided in one of the houses located on the property covered by said trust deed, and his brother, Judge Charles S. Miller, was acting as his legal adviser and assisting him in the management of his estate; that shortly after John E. Amos, Jr., became his attorney, Joseph J. Miller required his sisters to move out of the house in which they lived, he continuing to reside therein alone; that John E. Amos, Jr., thereupon made a demand upon Judge Miller that he deliver to him all the papers, abstracts of title, etc., of Joseph J. Miller, if any, in his possession, and Joseph J. Miller placed his Humboldt Park property on sale, and the same was within a few weeks sold for $4300 in cash, $1500 of which was paid to John E. Amos, Jr.; that on April 8, 1903, the State Bank of Chicago, in the presence of John E. Amos, Jr., paid Joseph J. Miller in cash $4000 upon the check of said Rosalie G. Amos, which check represented said $4000 note and trust deed; that the appellee was appointed

conservator of Joseph J. Miller April 28, 1903, and immediately made search for the property of said Joseph J. Miller, and especially the cash received as the consideration of the sale of said Humboldt Park property and the cash paid to him by the State Bank of Chicago upon the check of said Rosalie G. Amos, but the appellee was unable to find any property belonging to Joseph J. Miller other than the store building on Cottage Grove avenue and the two houses covered by said trust deed, the $4300 received from the sale of said Humboldt Park property and the proceeds of said $4000 check having disappeared, as well as all the private papers, abstracts of title, etc., of the said Joseph J. Miller.

The trial court found, among other things, that at the time said $4000 note and said trust deed were executed said Joseph J. Miller was insane, and that John E. Amos, Jr., and Rosalie G. Amos had notice of such fact, and the main contention made in this case by the appellant is that the evidence found in this record does not justify such findings.

A large number of witnesses testified to the physical and mental condition of said Joseph J. Miller at the time of the execution of said note and trust deed and for a number of years prior to the execution thereof. The testimony upon that issue was conflicting. The witnesses called by the complainant were persons who had known Joseph J. Miller for many years and had been intimately associated with him in a business and social way for periods, in many instances, of upwards of twenty-five years prior to the time of the execution of said note and trust deed, while the witnesses called by the defendants were tradesmen and business men who had known Joseph J. Miller only a short time or who had only seen and conversed with him in a casual manner, and it is clear that the testimony of the complainant's witnesses was entitled to much greater probative force than that of the witnesses produced by the defendants. The testimony of the witnesses of the complainant showed that for thirty-five years prior to the execution of said note and trust deed Jo-

seph J. Miller had been subject to epileptic fits; that for a time the disease did not apparently affect his mind but temporarily, and that between the attacks he was qualified to do business, but that with advancing age the attacks were more frequent and violent, and that latterly his physical and mental powers had become undermined from the effects thereof, and that for a number of years prior to the execution of said note and trust deed he had not been capable of transacting business. Mr. Edwin A. Potter, president of the American Trust and Savings Bank, and who was formerly a member of a firm engaged in commercial business, testified, in substance, that he had known Joseph J. Miller from June, 1872; that he was in the employ of witness' firm in 1872, and continued in its employ, and in that of its succeeding firm, until 1889, in which latter year witness quit the firm; that between 1872 and 1889 he saw Miller very frequently, and also saw him after 1889,—sometimes once a week, sometimes every two or three days; that from his earliest recollection of him he was subject to epileptic fits; that he would fall upon the street or floor unconscious; that he saw him have such fits very many times; that the attacks grew worse as he grew older and destroyed his capacity for business, and that witness could observe the waning of his memory and intellect; that in 1886 the firm, on account of his mental condition, discharged him, but in 1888, he seeming better, they took him back, when he traveled one year for the firm, but the firm, finding that he was not competent to do the business, again discharged him; that he was getting into quarrels whenever he went on the street car or train, and that he did not think he had been competent, at any time during the last ten years, to transact business successfully or intelligently. Silas S. Willard, who was Joseph J. Miller's attorney for twenty-five years, stated that Joseph J. Miller was of a very litigious nature lately,—more than when he first knew him; that he had changed in his language and apparent disposition in later years; that when he first knew him he

was mild, pleasant, amiable, gentlemanly, very companionable, but in later years was in trouble all the while with somebody and always going to sue somebody for enormous damages. Judge Charles S. Miller testified that he believed that for the last fifteen years his brother was incapable of transacting any business. He said the terrible disease that had afflicted him so many years had been gradually wearing his mentality and his body away, so that it became simply an instance of a man without brains or judgment to guide his motives; that he had many vagaries all the time; that before Judge Carter, on his trial, he asserted that he had not parted with any of his Humboldt Park property. "We had certified copies of the conveyances; showed them to my brother on the trial; asked if he had ever made those conveyances,—each one of them. He said no. Showed him some of the original deeds. He recognized his signature, but said he did not do it." These witnesses were corroborated by a number of witnesses, especially by Rev. Abraham H. Emmons, who lived in the house adjoining that in which Joseph J. Miller and his sisters resided for several years, who testified Joseph J. Miller was not, in his judgment, capable of transacting business in 1902 and 1903; that Joseph J. Miller at one time came into his house in a dazed condition and started to go up-stairs, mistaking his house for his own; that he saw him on three occasions in an unconscious condition, and at one time saw him fall upon the street and assisted him home; and also the testimony of Alice Ayling, the housekeeper of Rev. Mr. Emmons, who saw Joseph J. Miller very frequently.

The rule in this State is, that where the testimony is conflicting, as it is in this case, a court of review will not disturb the finding of the chancellor upon a question of fact unless it is clearly apparent the chancellor has committed error. (*Biggerstaff* v. *Biggerstaff*, 180 Ill. 407; *Elmstedt* v. *Nicholson*, 186 id. 580; *Dowie* v. *Driscoll*, 203 id. 480.) We are of the opinion the chancellor properly found that Joseph

J. Miller was lacking in mental capacity to execute said note and trust deed.

The next question to be determined is, did John E. Amos, Jr., and Rosalie G. Amos, have notice of the mental incapacity of Joseph J. Miller at the time of the execution of said note and trust deed? Charles S. Miller testified that in June, 1902, John E. Amos, Jr., appeared at his office in the city of Chicago as the attorney of a Mrs. Green, who had brought suit against Joseph J. Miller for the sum of $20,000 in one of the courts of record of Cook county, for the purpose of serving a notice upon him, as the attorney of Joseph J. Miller, with a view of having said cause placed upon the short cause calendar for trial. At that time he had an interview with Amos, in which he informed him his brother, Joseph J. Miller, was insane, fully explaining to him the cause of his infirmity and the number of years he had been afflicted; that thereupon John E. Amos, Jr., withdrew the notice and went away; that in October of the same year Amos again called upon him and served notice upon him, as the attorney of Joseph J. Miller, that he would appear in the court wherein said cause was pending and ask leave to withdraw his appearance as the attorney for Mrs. Green, and that on that occasion Amos informed him he had been retained by Joseph J. Miller as his attorney and would represent him thereafter. Judge Miller says he again informed Amos of his brother's mental condition, and stated to him that Joseph J. Miller had been making bad investments and losing his property, and that if he proposed to represent him he trusted he would prevent him from selling or squandering his property; that subsequent to that date Amos again called upon him and demanded that he deliver to him all the papers, abstracts of title, etc., in his possession belonging to his brother, Joseph J. Miller, and they again talked of the mental condition of Joseph J. Miller; that he delayed taking action to have a conservator appointed for his brother, as he feared his brother would resist the application and it would lead to

litigation which would be painful to the family; that subsequently he learned Joseph J. Miller was disposing of his property, and on the 18th day of April, 1903, he filed a notice in the recorder's office of Cook county for record wherein the real estate owned by Joseph J. Miller was described, and which stated that Joseph J. Miller was insane and incapable of conveying his property, and that on the 22d of April he filed a petition in the county court of Cook county asking to have a conservator appointed for Joseph J. Miller, and that after a hearing in the county court the appellee was appointed such conservator on the 28th day of April, 1903. It also appears that Joseph J. Miller, prior to the execution of said note and trust deed, staid all night on two occasions at the home of John E. Amos, Jr., and that Rosalie G. Amos met him at those times. While the note and trust deed bear date April 8, 1903, it clearly appears that the trust deed was not acknowledged or recorded until April 22, 1903. On the 8th of April, 1903, John E. Amos, Jr., and Joseph J. Miller appeared at the State Bank of Chicago together, and Miller presented to the paying teller of that bank the check of Rosalie G. Amos for $4000 for payment, and the same was paid to Joseph J. Miller; that upon the currency being handed to Miller, he and Amos repaired to a table in the bank outside the rail, where one or both of them proceeded to count the money, and that was the last seen of the money or any part thereof in Miller's possession. Miller, prior to his acquaintance with Amos, had been very economical. He had kept his money in a bank, had at times lived upon two meals a day, and did not expend to exceed $20 for clothing during any one year; that immediately after Amos commenced to represent him he ceased to keep a bank account, his private papers disappeared, also the $4300 in cash which he received in consideration of the sale of the Humboldt Park property, worth at least four times that amount, as well as the $4000 drawn from the State Bank of Chicago on April 8, 1903.

Rosalie G. Amos testified that her husband stated to her he represented Joseph J. Miller; that Miller wished to make a loan of $4000; that he first offered to her as security the Cottage Grove avenue property; that she declined to accept said property as security for the loan; that he then offered her the residence property where Miller lived; that she then agreed to make the loan; that Amos drew a check for $4000 payable to Joseph J. Miller, which she signed and delivered to Amos, with the understanding that he was to return to her therefor the promissory note of Joseph J. Miller for the sum of $4000, due in two years, drawing six per cent interest, and a trust deed upon Miller's residence property, and a guaranty policy covering the property. She said she knew nothing of the value of the property, the condition of the title or of the mental condition of Miller at the time she agreed to make the loan. She testified she had an estate of the value of $75,000 which she had inherited from relatives in the east, and that her husband did not represent her in transacting her business, and that she had always employed another attorney; that she consulted no one other than her husband with reference to the loan, but that Amos represented Miller in making the loan.

If John E. Amos, Jr., and Rosalie G. Amos had knowledge of the fact that Joseph J. Miller was insane and incompetent to execute said note and trust deed they dealt with him at their peril, and if they turned over to Miller $4000 in cash, and by reason of his insanity he lost or squandered said sum of money, a court of equity, at the suit of his conservator, properly might cancel said note and trust deed without requiring a return of said $4000 to Mrs. Amos or her executor. Especially is such the law if John E. Amos, Jr., and Rosalie G. Amos practiced a fraud upon Joseph J. Miller in obtaining said note and trust deed. (*Ronan* v. *Bluhm,* 173 Ill. 277.) The evidence shows that after John E. Amos, Jr., commenced to represent Joseph J. Miller he was at the house of said Miller repeatedly, and that he had Miller

at his house on two occasions, at least.   A number of the complainant's witnesses stated that it was impossible to converse with Miller any length of time without discovering he was mentally unbalanced, and the evidence shows that John E. Amos, Jr., had been notified that Joseph J. Miller was insane long before he had any business transactions with him. If Joseph J. Miller was insane he could not appoint John E. Amos, Jr., his agent to negotiate said loan; (*Dexter* v. *Hall,* 15 Wall. 9;) and we think it clear from the version of the transaction given by John E. Amos, Jr., and Rosalie G. Amos, that John E. Amos, Jr., was acting as the agent of his wife in making the loan, and if he was her agent in making the loan, then notice to him of the mental condition of Joseph J. Miller was notice to her, and there can be no reasonable conclusion reached, from a consideration of this record, other than that John E. Amos, Jr., was fully advised of the want of mental capacity in Joseph J. Miller at the time said note and trust deed were executed; and it appears that Rosalie G. Amos had seen Joseph J. Miller on two occasions, and at the time that the trust deed was executed there was a notice of record which described said property and informed all persons dealing therewith that Joseph J. Miller was insane and not mentally capable of conveying the same. We think the evidence clearly establishes that John E. Amos, Jr., and Rosalie G. Amos had notice of the mental incapacity of Joseph J. Miller at the time he executed said note and trust deed.

It is claimed, however, by John E. Amos, Jr., that he paid $449.44 as taxes and $86 as insurance out of said $4000 for the benefit of said Joseph J. Miller, and that in any event the lien of said trust deed should be sustained to that extent. We think it very questionable whether any part of the said $4000 was retained by Joseph J. Miller when he left the State Bank of Chicago, and the record does not establish that the taxes and insurance for which John E. Amos, Jr., seeks to establish a lien were paid by Amos, or, if paid by

him, that they were paid out of the $4000 received April 8, 1903, upon the check of Rosalie G. Amos. The check was cashed on April 8 and the trust deed was not executed until April 22. Amos was entrusted by his wife with said check, and it does not seem probable he would have delivered the check, or the proceeds thereof, to Miller on the 8th and received no security for the re-payment thereof until the 22d of April. It is far more probable that Amos retained possession of the fund until the trust deed was executed.

The appellant called one John H. Haskell, who stated that on April 8 he went from the office of John E. Amos, Jr., with Amos and Miller to the State Bank of Chicago, and that he saw $4000 paid on a check to Miller, whereupon Miller handed a $500 bill and a $50 bill to Amos and told him to pay the taxes, and that he was going to see Mr. Potter, and they then separated. This testimony is in conflict with that of the bank teller who paid the check, who testified that upon the payment of the amount of the check to Miller he and Amos went over to a table outside the rail and commenced to count the money. The chancellor who heard and saw Haskell evidently did not believe him, and we agree with the Appellate Court when it says, "We are not favorably impressed by the testimony of this witness."

Joseph J. Miller, at the time he fell into the hands of John E. Amos, Jr., was a weak old man. Within one year all his private papers had disappeared, from $15,000 to $20,000 worth of real estate had been converted into money at about one-fourth of its value, and the consideration received therefrom had also disappeared, and the wife of Amos had a note and trust deed for $4000 upon his home. During that time Joseph J. Miller was receiving an ample income from the Cottage Grove avenue store and the dwelling house in which he did not live, to support him and meet all his obligations, and had no occasion to sell his property or borrow money, and during the time that Amos represented Miller he seems to have been completely dominated by Amos.

From an examination of this record we are impressed with the conviction that the conclusions reached by the chancellor are correct, and that the Appellate Court properly affirmed the decree of the circuit court. The judgment of the Appellate Court will therefore be affirmed.

*Judgment affirmed.*