IRA S. POWELL, Appellant, *vs.* ROBERT W. HUEY, Appellee.—ROBERT W. HUEY, Appellee, *vs.* IRA S. POWELL *et al.* Appellants.—ROBERT W. HUEY, Appellee, *vs.* IRA S. POWELL *et al.* Appellants.

*Opinion filed June 16, 1909—Rehearing denied October 13, 1909.*

1. MORTGAGES—*what is not a variance between averment and proof in foreclosure.* The fact that a foreclosure bill alleges a direct and absolute liability on the note and mortgage whereas the proof shows that the mortgage was not given to secure an existing debt but to protect the mortgagee in signing as security for the mortgagor does not constitute such a variance as precludes a foreclosure for the amount due.

2. SAME—*when a note is within security of mortgage.* A note signed by the mortgagor's son with the mortgagee as surety, on which the mortgagor received the money, is within the security of the mortgage, where it appears from a written agreement signed by the mortgagor, his son and the mortgagee, and from the other facts in evidence, that the mortgage was intended to cover loans made for the benefit of the mortgagor, whether the notes were signed by him and his son or by either of them.

3. CONTRACTS—*contract to convey by good and sufficient warranty deed requires a title without encumbrance.* A covenant in a contract for the sale of land that the vendor will convey by a good and sufficient warranty deed requires the conveyance of a title free from encumbrance, and, in the absence of any agreement to the contrary, the vendor cannot demand specific performance if he is unable to fulfill such covenant, even though the vendee denies the execution and binding force of the contract when refusing to accept a title subject to an encumbrance.

4. PRACTICE—*when an appeal from specific performance decree lies to Supreme Court.* An appeal from a decree dismissing a bill for specific performance of a contract for the sale of land should be taken directly to the Supreme Court and not to the Appellate Court, where the making of the contract and the right of the vendor to compel the vendee to accept a conveyance of his title are contested.

APPEALS from the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Hancock county; the Hon. JOHN A. GRAY, Judge, presiding.

On October 6, 1906, Robert W. Huey sued Ira S. Powell and William A. Powell in the circuit court of Hancock county in an action of assumpsit. On January 21, 1907, he filed a bill against the same parties and Martha M. Powell, wife of William A. Powell, for the foreclosure of a mortgage. On March 2, 1907, Ira S. Powell filed a bill against Robert W. Huey for the specific performance of a contract of sale of real estate. The suits all involved the same transactions, and a jury having been waived in the common law suit, the cases were all submitted to the court for hearing at one time. The court rendered judgment in the action of assumpsit against the defendants for $2424, decreed a foreclosure of the mortgage for $8483.61, and dismissed the bill for specific performance for want of equity. The judgment and decrees have been affirmed by the Appellate Court and the cases are now here as separate appeals. They were argued together and will be disposed of in one opinion.

Robert W. Huey and William A. Powell are brothers-in-law. On August 18, 1903, Huey, as surety, signed Powell's note to O. J. Talbot for $800, due in one year. Powell owned two farms near Carthage, in Hancock county,—one of about ninety acres, on which he lived, and another of about one hundred and fifty acres, known as the Coke farm. On September 24, 1903, he mortgaged both these farms to Davis Brown for $12,000, due in five years, and on the same day, expressly subject to said mortgage, he and his wife executed a second mortgage to Huey to secure their note of that date for $7000, made payable to Huey five years after date, with five per cent interest, payable annually, as evidenced by interest notes. This mortgage was given only to protect Huey in signing as surety for Powell. After the giving of these mortgages, Ira S. Powell, who is the son of William A. Powell and Martha M. Powell, became of age, and they soon after conveyed both farms to him. Afterwards, on September 13, 1905, Huey borrowed

for one year $5000 of the Union National Bank of Macomb on his own note but for William A. Powell, who received the money. Ira S. Powell and William A. Powell then gave their note to Huey for this amount, due in one year, and all three signed a statement certifying that the mortgage of September 24, 1903, was to be held by Huey as security on notes given to him by the Powells, and also for notes endorsed or signed by him with Ira S. Powell and William A. Powell, and that when all notes owed by them to Huey, and also the notes endorsed or signed by Huey with Ira S. and W. A. Powell, were paid and canceled, the mortgage and note were to be delivered to Ira S. Powell. On August 4, 1906, Huey signed as surety Ira S. Powell's note to the Hancock County National Bank for $4541.37, due in ninety days, this being a renewal of other notes which had been running for six or nine months and on which William A. Powell had received the money.

At the beginning of September, 1906, the Talbot note for $800 was past due, the $5000 note to the Union National Bank would mature on the 13th, the interest on the $12,000 mortgage would be due on the 24th, and the note for $4541.37 to the Hancock County National Bank on November 2. In view of this situation William A. Powell proposed to Huey that Huey should buy the Coke farm, and on Monday, September 10, they went to Carthage, at Powell's suggestion, to make some arrangements about the matter. Sidney C. Powell accompanied them. What occurred at Carthage is the serious question of fact in the case. It is certain that the matter of the purchase of the Coke farm by Huey for $18,750 ($125 an acre) was discussed, and the question of how much money Huey could borrow on that farm and his own, and of how much would be left which Powell must provide for, was considered. Huey and William A. Powell went to the office of Charles H. Garnett, a lawyer, to see what Huey could do about borrowing the money, and Garnett went with Huey to an-

other office but no loan was made.   The chief controversy
in the testimony is over what took place in Charles H. Gar-
nett's office.   Huey testified that he and William A. Powell
went, together with Sidney C. Powell, to Garnett's office in
the forenoon, and while they were there Garnett prepared
an application for a loan on the Coke farm and Huey's
farm, which Huey signed; that he was in Garnett's office
only once that day and signed only one paper, which was
represented to him to be an application for a loan; that
the day was dark and he could not read the paper with his
glasses, though he tried; that he did not agree to buy the
farm and signed no contract to do so to his knowledge.
William A. Powell, who was the moving and active party
in the sale of the land, was not examined as a witness.
Garnett testified that Sidney C. Powell did not come to
Garnett's office with William A. Powell and Huey in the
forenoon but that the latter two came alone; that Powell
told him that Huey had bought the Coke place and wanted
to see him about borrowing some money; that he told them
he was not making loans but went with Huey to Mr. Kel-
ly's office, and that before leaving his office, or after they
got on the street, one of them said a contract should be
prepared for the sale of the land, and he told them he could
prepare it.   Garnett and Sidney C. Powell both testified that
in the afternoon the two Powells and Huey came to Gar-
nett's office and that there a contract was prepared by Gar-
nett for the sale of the Coke farm to Huey for $18,750.
The premises were to be conveyed to Huey by good and
sufficient warranty deed on or before September 24, 1906,
and possession was to be then delivered.   The consideration
was to be paid, in part, by the assumption of the Hancock
County National Bank note and the remainder in cash on
the delivery of the deed.   They also testified that Huey
signed this contract and that William A. Powell signed
Ira S. Powell's name to it, and a contract so signed was
produced at the hearing.   They testified further that it was

agreed there that the remainder of the $18,750, after the payment of the note for $4541.37, was to be paid by Huey's paying the Talbot note and the $5000 Union National Bank note and by his assuming so much of the $12,000 mortgage as the remainder of the purchase money would amount to.

On September 12 Ira S. Powell in person signed the contract which had been left with Garnett, and on the 24th Garnett tendered to Huey a warranty deed of the Coke farm, which had been executed by Ira. S. Powell. Huey said that he had never told Ira to make him a deed and did not want to take it. Huey paid the Union National Bank note, amounting to $5300, on September 24, and the Hancock County National Bank note of $4541.37 at maturity, and the Talbot note.

DAVID E. MACK, WILLIAM H. HARTZELL, JOHN W. WILLIAMS, and JOHN D. MILLER, for appellants.

CHARLES J. SCOFIELD, and APOLLOS W. O'HARRA, for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

The evidence was in direct conflict as to whether the contract bearing Huey's signature was knowingly executed by him or he was deceived into signing it, believing it to be an application for a loan. The circumstances, aside from the testimony of the three witnesses who testified directly on the subject, which were relied upon by either side as corroborative of their respective contentions, were consistent with either view. The evidence was heard in open court, and under such circumstances the findings of fact by the chancellor will not be disturbed unless it is clearly apparent that they are wrong. (*Amos* v. *American Trust and Savings Bank,* 221 Ill. 100; *Heyman* v. *Heyman,* 210 id. 524.) It is not necessary, however, to determine the question, because, even if it be conceded that a binding

contract was entered into, the judgment and decrees of the circuit court will not be affected thereby.

The contract required Ira S. Powell to convey to Huey by a good and sufficient warranty deed. Such a covenant required the conveyance of a title free of encumbrance. (*McCord* v. *Massey,* 155 Ill. 123; *Morgan* v. *Smith,* 11 id. 194; *Brown* v. *Cannon,* 5 Gilm. 174.) On the day appointed for the delivery of the deed the land was encumbered by the Brown mortgage of $12,000 and the $7000 mortgage to Huey. There is no question that the latter mortgage stood as security for the Talbot note and the $5000 note. These encumbrances, with interest, amounted to $18,748. The purchase money, after deducting the Hancock County National Bank note, amounted only to $14,-208.63, leaving a difference of more than $4500 still a lien on the premises. The bill for specific performance alleged, as it was necessary that it should, that complainant had always been ready and willing to perform his part of the agreement on being paid the remainder of the purchase money and to deliver the deed to Huey and to let him into possession of the premises, but no evidence was offered of Ira S. Powell's ability to convey the title agreed to be conveyed. On the contrary, it is to be inferred that he could not do so. The $12,000 mortgage was not due until 1908. It is true that the privilege existed of paying it on September 24, 1906 or 1907, but Ira S. Powell had not the money with which to pay it, so far as this record shows. William A. Powell, with Huey, had applied to Fred Churchill, who represented the owner of the mortgage, to see if he could arrange to carry $4500 of the amount on the home place of ninety acres, and Mr. Churchill told them he thought he could do so, but later found that he could not furnish the money and told them he would have to let the loan stand as it was or they could take it up at interest-paying time. No further effort appears to have been made to remove the encumbrance. At any rate it was not re-

moved and the record contains no indication that it could be removed. The complainant, being himself unable to perform, was not in a position to compel performance.

It is, however, contended that Huey repudiated the contract and thereby put an end to the necessity of any further performance by Powell. The only evidence of any effort at performance by Powell after Churchill refused to divide the Brown mortgage is that he executed a deed and had Garnett tender it to Huey. Huey declined to receive it, and in response to Garnett's statement, "You bought the farm or contracted to buy it," said: "Well, I have no doubt you understood that from what I said; no doubt you thought so, but there are things to it you don't know; there is more about the transaction you don't know." This is all the record contains as to what took place on that occasion, and it certainly indicated no waiver of anything on Huey's part. This occurrence furnishes no excuse for anything less than full performance on the part of Powell, if he desired to enforce performance on the part of Huey. His contract required the conveyance of a title free from encumbrance, and even if Huey had denied the execution of the contract and its binding force upon him, this would not authorize the court to force upon him a title subject to an encumbrance for $4500.

It is further insisted that the agreement nowhere shows that the Davis Brown mortgage was to be actually divided; that it could have been carried as a mortgage on the two farms, Powell and Huey each providing for his proportionate share of the debt. The written contract required the Coke farm to be conveyed to Huey free from encumbrance. If the parol evidence is to be considered, Garnett testified that Huey was to pay the three notes for $800, $5000 and $4541.37, respectively, and for the balance of the purchase money was to assume so much of the Davis Brown mortgage; that his part was expected to be independent of Powell's and to be on the Coke farm, while Powell would

have $4500 on his farm; that the understanding was that
the entire mortgage was to be paid, and Powell was to give
a new mortgage for $4500 on his farm and Huey was to
borrow the full $18,750 on the Coke farm and his home
farm.   Sidney Powell testified that Ira was to take care of
the balance of the $12,000 mortgage; that they were to see
if Churchill could divide it, and if not, they were to pay
it off.   There is, therefore, no evidence that it was agreed
that any part of the $12,000 mortgage should remain
against the Coke farm or that any modification of the writ-
ten agreement was made in this respect.

The question of the right to the specific performance of
the contract is considered only because of its bearing on
the foreclosure and assumpsit cases.   The decree dismiss-
ing the bill for specific performance is not properly before
us.   The making of the contract and the right of the ven-
dor to compel the vendee to accept a conveyance of his title
are contested.   A freehold was involved in that decree and
the appeal from it was improperly taken to the Appellate
Court.

In regard to the foreclosure case, it is insisted that the
proofs do not correspond with the allegations of the bill.
The bill alleged the existence of a debt of $7000, the exe-
cution of the note and mortgage and default in the pay-
ment of interest, in the usual form.   The proof showed
that the mortgage was not given to secure an existing debt
but for the purpose of protecting the mortgagee in signing
as security for William A. Powell.   The bill alleges a di-
rect and absolute liability on the note and mortgage.   The
proofs show a collateral and indirect liability.   This same
question of variance arose in the case of *Collins* v. *Carlile,*
13 Ill. 254, where a bill was filed in the usual form to fore-
close a mortgage given to secure a note for $500.   In real-
ity the mortgage was given to secure the price of goods to
be thereafter sold, and goods were thereafter sold at vari-
ous times to the amount of more than $2000.   Payments

made from time to time reduced the indebtedness to $400. The bill having been dismissed upon a hearing, the decree was reversed, the court saying (p. 260) : "Another objection to a recovery in this case has been raised, which is, that the bill being in the ordinary form of bills to foreclose, without setting forth the real consideration of the mortgage, the complainants must fail in this suit for the reason that the allegations and the proofs do not correspond. The bill shows a case in which the complainants would clearly be entitled to a decree. It was not necessary to set forth the consideration of the $500 note, because, *prima facie*, it imported a good and sufficient consideration. This was all that was requisite, in the first instance, on the part of the complainants. The defendants come in and inquire into the consideration of the note, which they had a right to do. The proof shows that the complainants are not entitled to a decree for the full amount claimed. It is surely no objection to their having a decree for what is due because they have claimed too much; and it is immaterial what the consideration of the note was, so it was good and valuable. The recovery is at last upon the mortgage as set forth in the bill, though the extent is limited by the facts disclosed by the testimony. The evidence does not show a different case from that stated in the bill, but it brings into the case facts not stated and not necessary to be stated in complainants' bill to entitle them to a decree. There is not, in our opinion, such a variance between the allegations and proofs as to prevent a decree of foreclosure in this suit."

The further objection is made that the mortgage was not due. By its express terms the mortgagee was entitled to elect to declare the principal due, three of the annual interest notes being past due and unpaid when the bill was filed. He had paid about $10,000 of the indebtedness against which it was intended to indemnify him. The amount of the past due interest was therefore due, and not

having been paid, the mortgagee might rightfully exercise his option to declare the whole amount secured by the mortgage due.

It is contended that the note for $4541.37 to the Hancock County National Bank was not secured by the mortgage because it is not signed by Huey with Ira S. and W. A. Powell, but with Ira alone. This note was a renewal of previous notes, and the debt arose after the execution of the agreement between William A. Powell, Ira S. Powell and Huey, dated September 13, 1905. The note was signed by Ira S. Powell and Huey and the money which it represented was received by William A. Powell. The agreement referred to is as follows:

"MACOMB, ILL., *Sept. 13, 1905.*

"This is to certify that William A. Powell and Martha M. Powell have given Robert W. Huey a note and mortgage of $7000, dated September 24, 1903, to be held by said Robert W. Huey as security on notes given to him by Ira S. Powell and William A. Powell and also for notes endorsed or signed by him with Ira S. Powell and William A. Powell. It is agreed that when all the notes owed by W. A. or Ira S. Powell, or both of them, to Robert W. Huey, and also the notes endorsed or signed by Robert W. Huey with Ira S. and W. A. Powell, are paid and canceled, then this mortgage and note are to be delivered to Ira S. Powell.

R. W. HUEY,
I. S. POWELL,
W. A. POWELL."

This writing was made for the purpose of extending to the $5000 note executed the same day, the benefit of the security of the mortgage. It is manifest that it was also intended to apply to future transactions. So far as appears, Ira S. Powell never had anything to do with the management of the farms or with any financial transactions except in connection with his father. The relations of the parties, their methods of doing business and the nature of their transactions make it evident that whether such transactions were in the name of William A. Powell or Ira S. Powell, they were for the benefit of William A. Powell.

The name of Ira S. Powell was inserted in the writing because the title to the land had been placed in him, and the writing was intended to extend to notes endorsed or signed by Huey with either of them.

No defense was shown to the assumpsit suit, and the judgments of the Appellate Court affirming the judgment in that case and the decree in the foreclosure suit will be affirmed. The judgment of the Appellate Court in the specific performance case will be reversed and the cause remanded to that court, with directions to order the appeal transferred to this court.

*Reversed in part and remanded, with directions.*